## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| LIBERIAN INTERNATIONAL SHIP AND CORPORATE REGISTRY LLC<br><br>      Plaintiff,<br><br>   v.<br><br>LEGALITY HOLDINGS, S.A.<br><br>      Defendant. | No.  1:20-cv-852<br><br>COMPLAINT<br>AND JURY DEMAND |

## <u>NATURE OF THE ACTION</u>

1.     Plaintiff Liberian International Ship and Corporate Registry LLC ("LISCR") brings this action seeking a declaratory judgment in response to unreasonable and baseless demands for payment made by Legality Holdings, S.A. ("Legality"), and in the alternative, damages for breach of contract arising out of Legality's failure to perform fundamental contractual obligations pursuant to the contracts between LISCR and Legality.

2.     LISCR had previously contracted with Legality for a 20-year period, but all contractual obligations expired on December 31, 2019.  Rather than accept that (i) all contractual obligations have now expired under the clear, unambiguous terms of the Parties' contractual relationship and (ii) LISCR no longer owes Legality any money, Legality has embarked on a campaign to extract ongoing, excessive, and unjustifiable payments from LISCR by manufacturing claims under an earlier agreement between the Parties from 2000—notwithstanding the fact that the 2000 agreement was superseded, not once, but twice.

3.     LISCR administers one of the largest shipping registries in the world, as well as a corporate registry, on behalf of the Liberian Government.

4.      Set up by American shippers after World War II, the Liberian maritime registry includes thousands of ships from all around the world.  It is an open registry, meaning that ships of any nationality or residency can register to join.  Due to Liberia's advantageous regulatory regime and favorable international treaties with major port countries, the Liberian maritime registry has become one of the world's top three shipping registries.

5.      Liberia's corporate registry is likewise an established registry for corporations operating around the world.  Similar to the maritime registry, the corporate registry is not limited to corporations based in Liberia but is open to corporate entities around the world.  Liberia's simple and cost-efficient administration requirements have made Liberia a sought-after destination for incorporation.

6.      LISCR was founded in 2000 to manage these registries on behalf of the Liberian Government.  LISCR manages the day-to-day operations of registering ships and corporations for Liberia, collecting ship and corporate registry fees and taxes and transferring them to the Liberian Treasury.  When LISCR signed its first contract with the Liberian Government in 2000, Liberia's maritime registry had been steadily losing ship registrations and had fallen behind the Panamanian registry as the world's leading open registry due to unrest caused by Liberia's 1989 and 1999 civil wars.  Beginning in 2000, LISCR sought to restore the Liberian maritime registry to its former place of prominence and also grow the Liberian corporate registry.  As part of its efforts, LISCR engaged various international business consultants to assist LISCR in increasing the number of ship and corporate registrations in Liberia.  One of those consulting companies was Legality.

7.      LISCR and Legality entered into a series of contracts to govern their respective rights and obligations.  The first agreement was entered in 2000 (the "2000 Agreement"), and laid out the terms by which LISCR would compensate Legality for its services.  In 2011, the Parties

rewrote their contract and devised a new payment scheme that fundamentally altered their relationship and, importantly, agreed to a fixed end date of December 31, 2019, to which Legality understood and agreed. This new agreement (the "2011 Agreement") included a clear and superseding choice of law provision as well, through which the Parties agreed that Virginia law rather than UK law (as previously specified in the 2000 Agreement) would govern their contractual relationship. The 2011 Agreement unambiguously superseded the 2000 Agreement. In 2014, the Parties again reconceived their relationship and replaced the earlier contract to reflect a new payment scheme (the "2014 Agreement"). This 2014 Agreement once again clearly spelled out and re-confirmed in writing that the Parties would conclude their relationship at the end of 2019.

8.      LISCR paid Legality all fees owed to Legality under the 2000 Agreement, the 2011 Agreement, and the 2014 Agreement (collectively, the "Agreements") and, pursuant to the unambiguous terms of the 2014 Agreement, the Parties' contractual relationship ended on December 31, 2019.

9.      Despite this, LISCR now faces repeated, unsubstantiated demands from Legality for payment based on Legality's erroneous and disingenuous assertion that the Parties are forever bound by the twenty-year old and twice-superseded 2000 Agreement. Legality's insistence on payment under an extinguished contract is not only untenable on its own terms, but doubly contrary to law because Legality has been repeatedly in breach of the very contract it seeks payment under during the course of at least six years: indeed, it failed to perform the Registry-promoting services it was obligated to perform under these Agreements (and for which it was paid).

10.      This case involves an actual controversy over whether the Parties' contractual relationship terminated at the end of 2019, as the 2014 Agreement so specifies. Accordingly,

LISCR seeks a judgment from this Court declaring that it has no further contractual obligations to Legality.  In the alternative, LISCR seeks damages from Legality's repeated breaches.

## THE PARTIES

11.    Plaintiff Liberian International Ship And Corporate Registry LLC ("LISCR") is a company organized under the laws of Delaware, with its principal place of business at 22980 Indian Creek Drive, Dulles, Virginia.

12.    Defendant Legality Holdings, S.A. is business consulting company organized under the laws of Liberia, with its principal place of business in Greece.

## JURISDICTION AND VENUE

13.    This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(2).

14.    This Court has personal jurisdiction over Defendant Legality because it systematically conducted business in Virginia, including by entering into contracts with a corporation based in Virginia, traveling to Virginia regularly to meet with LISCR personnel and to negotiate the terms of Legality's relationship with LISCR, regularly communicating by email and telephone with LISCR personnel located in Virginia, and regularly receiving payments via wire that originated from LISCR's Virginia-based bank accounts.

15.    Venue is properly vested in this Court pursuant to 28 U.S.C. § 1391 because most of the conduct that underlies this action occurred in the Eastern District of Virginia.

16.    There is a present and actual controversy between the Parties.

17.    The declaratory judgment requested is authorized pursuant to 28 U.S.C. §§ 2201 and 2202.

## STATEMENT OF FACTS

### A.  LISCR's Administration of the Liberian Registry

18.     Since January 1, 2000, LISCR has been responsible for operating and administering the Liberian International Ship and Corporate Registry on behalf of the Government of Liberia, which is comprised of two of the leading registries in the world for vessels and corporations, respectively.

19.     <u>Maritime Registry</u>.  The Maritime Registry is one of the world's largest shipping registers, comprising over 4,400 vessels aggregating over 170 million gross tons and representing 12 percent of the world's ocean-going fleet.

20.     The Maritime Registry has been operated from the United States since its inception, and Liberian law requires the Registry to be operated from the United States to this day.  Over the years, Liberian shipping regulations developed in ways that were favorable to ship owners. Additionally, the Liberian flag, flown by every ship in the Registry, is recognized at ports around the world and given favorable treatment at important industrial ports.

21.     The Maritime Registry was a fast success, and in less than two decades after its founding, it surpassed the United Kingdom as the world's largest ship registry.  However, due to the 1989 and 1999 Liberian civil wars, ship registrations fell, and the Maritime Registry temporarily lost its place as the world's premier open registry.

22.     At the turn of the twenty-first century, the President of Liberia contracted with LISCR to restore the Maritime Registry to prominence.  Under this authority, LISCR has run the Maritime Registry since January 1, 2000.  To aid in the growth of the Registry, LISCR contracted with a number of business consultants in different regions to promote Liberian ship registration.

23.    Under LISCR's management, the Registry has experienced significant growth in fleet size and registered tonnage, and today, it is one of the fastest growing major open registries in both the shipping and offshore sectors, with a growth rate significantly higher than its nearest competitors.

24.    <u>Corporate Registry</u>.  The Corporate Registry was also founded in 1948.  The efficient formation and administration process for Liberian corporations, Liberia's commercially-tested legal system (its corporate law is based on U.S. corporate law), and Liberia's commitment to protecting confidentiality and security, among other qualities, have made Liberia a choice incorporation jurisdiction for corporate entities that operate around the world.

25.    The Corporate Registry has been administered by LISCR since January 1, 2000, pursuant to contracts with the Government of Liberia, as described further below.  Moreover, LISCR's subsidiary, The LISCR Trust Company, acts as the exclusive registered agent for all Liberian non-resident corporate entities.  To aid in the growth of the Corporate Registry, LISCR similarly contracted with a number of business consultants in different regions to promote incorporation of Liberian corporations.  As LISCR has become an established company, LISCR's relationships with business consultants hired at the outset of LISCR's tenure have evolved to meet the changing demands of the Registry and other changing circumstances.

26.    <u>LISCR's Agreements with the Government of Liberia</u>.  Since 2000, LISCR has administered both the Maritime and Corporate Registries pursuant to contracts with the Government of Liberia.

27.    LISCR is internationally recognized for its professionalism and commitment to providing quality customer service, and employs industry professionals who understand the business of shipping and corporate structures.  LISCR's proficient administration has made the

Liberian Registry one of the most effective and tax-efficient ship and corporate registries in the world.

**B.  LISCR's Relationship with Legality**

28.     Shortly after contracting with the Government of Liberia to administer the Liberian Registry as of January 1, 2000, LISCR entered into a contract with Legality to assist LISCR with promoting the Liberian Registry in certain European countries.  The respective rights and obligations of LISCR and Legality were set forth in three successive contracts that began in 2000 and unambiguously expired in December 2019.

29.     The 2000 Agreement.  On March 10, 2000, Legality and LISCR entered into the 2000 Agreement.  As set forth in paragraph 1 of this Agreement, Legality was responsible for promoting the Liberian Registry to corporations based in Greece, Turkey, the Balkans, Russia, Ukraine, Cyprus, and the Middle East (except Israel) (the "Specified Region").  At that time, LISCR understood that Legality's principal, Nikolaos Soutos, was a well-connected businessman and would be able to help promote the Liberian Registry.

30.     As set forth in the 2000 Agreement, Legality agreed to "use its best professional endeavors to broaden the spectrum of the prospective parties interested in setting up Liberian Corporations." 2000 Agreement ¶ 1.  Legality also represented that it had "expertise in promoting the credibility of the Liberian Corporations and widening the spectrum of people, being interested in opting for the foregoing." 2000 Agreement, page 1.

31.     In exchange for Legality's services, LISCR agreed to pay Legality certain fees, which were enumerated in the Agreement.

32.     First, LISCR agreed to pay Legality a one-time formation fee for each new company incorporated in Liberia from the Specified Region:  the fee was $100 per company for

companies formed in 2000, and $50 per company for companies formed in 2001 and later.  2000 Agreement ¶ 2.

33.     Second, LISCR also agreed to pay an annual fee of $50 per company per year, for all companies registered in Liberia from the Specified Region.  2000 Agreement ¶ 3.

34.     These formation and annual fees to Legality were akin to commissions, representing a portion of the fees the Liberian companies had paid to LISCR for its corporate administration and formation services.

35.     The Agreement did not have a set end date, but provided that it would "remain in full force and effect as long as the Contract between LISCR and the Republic of Liberia remains in existence."  2000 Agreement ¶ 6.

36.     Between 2000 and October 2010, LISCR paid Legality the fees owed under this Agreement, paying an approximate total of $1,200,000.  These payments were sent to Legality's bank accounts outside of the United States and originated from LISCR's bank account in Virginia.

37.     During these years, Nikolaos Soutos—and later his son, Alexandre Soutos (as well as other Legality personnel)—traveled regularly to LISCR's headquarters in Virginia to discuss both their relationship and performance under it.  On average, Legality representatives traveled to Virginia once per year.  In addition, Legality employees regularly corresponded via email and telephone with LISCR employees based in Virginia.

38.     The 2011 Agreement.  On July 6, 2011, LISCR and Legality entered into a new agreement—the 2011 Agreement—that superseded the contractual rights and obligations of Legality and LISCR with respect to the administration of the Liberian Registry.  LISCR and Legality both understood the 2011 Agreement to operate as a new, superseding contract between the Parties to govern their ongoing relationship.

39.     As the Parties' relationship developed and LISCR had solidified its name and reputation in Liberia and elsewhere, LISCR contacted Legality in order to revise the Parties' contractual relationship, re-defining the nature of LISCR's payments to Legality to better reflect the Parties' relative roles in administering the Registry.  Additionally, unlike the 2000 Agreement, which had a term length tied to the length of LISCR's contract with the Liberian Government, the 2011 Agreement included a clear, firm, and definite conclusion to the Parties' contractual relationship:  per its terms, the Agreement had an effective date of January 1, 2011 and expired on December 31, 2019.  2011 Agreement ¶ 2.  Although Legality understood LISCR's agreement with the Government of Liberia would likely extend beyond 2019, Legality agreed to a fixed and firm termination date of December 31, 2019.

40.     The 2011 Agreement recognized that Legality "markets the Liberian corporate program and sells Liberian non-resident entities plus ancillary services" and required that Legality "shall provide new corporate entities and Certificates of Good Standing for its clients."  2011 Agreement page 1 & ¶ 4.

41.     The 2011 Agreement made a number of other changes to the material terms of the Parties' relationship set out in the 2000 Agreement, which demonstrate the Parties' understanding and expectation that the 2011 Agreement superseded and replaced the earlier agreement.

42.     First, the 2011 Agreement revised the payment structure for the fees that LISCR agreed to pay Legality for its services.  With respect to incorporation fees, LISCR agreed to pay Legality $263.50 for each incorporation.  2011 Agreement ¶¶ 5–7.  Unlike the 2000 Agreement, the 2011 Agreement did not require LISCR to pay any regular annual fees for companies that had previously been incorporated.

43.     The 2011 Agreement also included a new and different choice of law provision. Unlike the 2000 Agreement (which provided that it would be governed under UK law), the 2011 Agreement provided that it and any amendments "shall be construed in accordance with Virginia law."  2011 Agreement ¶ 10.  The Parties' decision to adopt a new and different choice of law provision unambiguously reflected the Parties' intent and understanding that the 2011 Agreement replaced the 2000 Agreement.

44.     These core changes to the Parties' previous agreement reflect a clear intent to create a new, superseding contract—it would make little sense for the Parties to have two, overlapping contracts that contained conflicting payment structures and conflicting choice-of-law provisions in the event of a dispute between the Parties.

45.     Between July 6, 2011 and October 2013, LISCR paid Legality the fees owed under this Agreement, paying an approximate total of $60,000.  These payments were sent to Legality's bank accounts outside of the United States and originated from LISCR's bank account in Virginia. During these years, LISCR did not make any payments under the scheme set forth in the 2000 Agreement, and no one from Legality asserted or otherwise indicated their belief that payments calculated under the 2000 Agreement were also owed.

46.     During these years, Alexandre and Nikolaos Soutos and other Legality personnel traveled regularly to LISCR's headquarters in Virginia both to negotiate the agreement and to discuss the Parties' performance under it.  On average, Legality representatives traveled to Virginia once per year.  In addition, Legality employees regularly corresponded via email and telephone with LISCR employees based in Virginia.

47.     The 2014 Agreement.  In 2013, 13 years after their contractual relationship first began and based on their evolving experiences continuing to administer and promote the Registry, Legality and LISCR began discussions to further revise their relationship.

48.     In particular, Nikolaos Soutos met with Scott Bergeron, then the Chief Operating Officer of LISCR, and they agreed to revise the 2011 Agreement so that Legality would receive payment of fixed fees on a quarterly basis, rather than fees on a monthly basis that varied depending on the number of incorporations that month.  Based on their discussions, Legality and LISCR entered into the 2014 Agreement, which they intended and understood would supersede the 2011 Agreement.  The terms of this Agreement were negotiated and finalized in Virginia.

49.     As the Parties had discussed, the 2014 Agreement revised the payment structure for fees owed to Legality:  specifically, LISCR agreed to make quarterly payments to Legality of $62,500 ($250,000 annually) for "Corporate and other Maritime services"; and provided that all new Certificates of Good Standing and new incorporations arranged by Legality were to be "paid in full to the Registry at published rates" ($713.50 for new incorporations, and $150 for certificates of good standing).  2014 Agreement ¶¶ 6–7.

50.     The 2014 Agreement also explicitly suspended the $263 "new incorporation commission" and "certificate of goodstanding fee waiver," as set forth in the 2011 Agreement. 2014 Agreement ¶ 3.

51.     Furthermore, in the 2014 Agreement, LISCR waived certain unpaid maritime fees owed by Legality (totaling approximately $65,000), and waived all future maritime fees for certain vessels (M/V Alianca Sky, M/V Amber Halo, M/V Samos Legend) (totaling approximately $75,000 per year).  2014 Agreement ¶¶ 4–5.

52.     This Agreement had an effective date of January 1, 2014, and, like the 2011 Agreement, again specified that the Parties' new, superseding contract would expire on December 31, 2019.  Thus, the Parties clearly understood and reaffirmed that their contractual relationship would have a fixed and certain end date of December 31, 2019—unlike the original 2000 Agreement that had a term length tied to the length of LISCR's agreement with the Government of Liberia.  At the time the 2014 Agreement was signed, Legality was well-aware that LISCR's contract with the Government of Liberia would likely continue past 2019, but nevertheless reaffirmed its relationship with LISCR would terminate December 31, 2019.  This termination date reflected the Parties' understanding and awareness that Legality's role in promoting the Registry had declined and LISCR no longer needed Legality's services.

53.     Between October 2013 and December 2019, LISCR paid Legality the fees owed under this Agreement, paying an approximate total of $1,500,000 (which included an advance of $200,000 paid in October 2013).  These payments were sent to Legality's bank accounts outside of the United States and originated from LISCR's bank account in Virginia.  During these years and until LISCR indicated that it would not extend the Agreement past the termination date of December 31, 2019, no one from Legality asserted or otherwise indicated that the 2000 Agreement remained operative, much less communicated a belief that payments calculated under the 2000 Agreement were also owed to Legality.

54.     During these years, Alexandre and Nikolaos Soutos and other Legality personnel traveled regularly to LISCR's headquarters in Virginia both to negotiate the agreement and to discuss the Parties' performance under it.  On average, Legality representatives traveled to Virginia once per year.  In addition, Legality employees regularly corresponded via email and telephone with LISCR employees based in Virginia.

55.    <u>Legality's Conduct in Virginia</u>.   Throughout the 20-year span of the Parties' relationship, Legality regularly and systematically engaged in conduct in Virginia or directed at Virginia.   For instance, Legality knowingly entered into three contracts with an entity headquartered in Virginia.   Indeed, the 2011 Agreement and 2014 Agreement plainly state that LISCR's "principal place of business" is in Virginia.

56.    Legality personnel also traveled to Virginia regularly to meet with LISCR.   Two of Legality's executives, Alexandre and Nikolaos Soutos, traveled to Virginia approximately once per year to meet with LISCR or negotiate the terms of their relationship.   Their last trip to Virginia was in February 2019.

57.    Throughout their relationship, Legality's employees also regularly communicated with LISCR's employees in Virginia via both email correspondence and telephone.   Although LISCR also had employees that were based in Greece, the majority of Legality's communications with LISCR were with LISCR employees in Virginia.

58.    The regular payments owed by LISCR to Legality under the three Agreements also originated from LISCR's bank account in Virginia.

### C.  Legality's Failure to Perform Its Contractual Obligations

59.    Beginning no later than 2014, Legality ceased performing material duties under the Agreements.   Namely, Legality failed to "support, promote and yield benefits that accrue to the Liberian Registry," as it was legally obligated to do under the 2014 Agreement.   Notably, Legality downsized its staff and its principal executive, Nikolaos Soutos, handed virtually all responsibilities to his son, Alexandre Soutos, who was less connected and less involved in Legality's business.   Over the ensuing years, Legality failed to adequately perform its contractual services, and the number of new registrations, originating as a result of Legality's efforts, fell

dramatically.  Alexandre Soutos also failed to keep LISCR informed and up-to-date on his (and Legality's) promotional activities on behalf of LISCR.  Even so, Legality has continued to accept payments from LISCR, despite not providing the services it was required to provide under the Agreement.

60.     Beginning no later than 2014, Legality also ceased to "market[] the Liberian corporate program and sell[] Liberian non-resident entities plus ancillary services" and "provide new corporate entities and Certificates of Good Standing for its clients"—which the 2011 Agreement required.

61.     Furthermore, beginning no later than 2014, Legality also failed to "use its best professional endeavours to broaden the spectrum of the prospective parties, interested in setting up Liberian Corporations"—which the 2000 Agreement required.  The reputation of Legality's principals—Alexandre and Nikolaos Soutos—has also suffered during this same time period as a result of poor management of their own shipping company ("Samos Maritime"), which has been found to be in violation of certain rules in the Maritime Labour Convention.  These violations have, in turn, negatively impacted the reputation and growth of the Corporate Registry among Greek shipowners (who are the predominant customer base for the Corporate Registry), because of Legality's affiliation with LISCR.

62.     Legality's failure to adequately perform its contractual obligations has led to a dramatic decline in the number of annual corporations incorporated in Liberia and the number of Certificates of Goodstanding being issued as result of Legality's efforts, as shown in the chart below for years 2010 through 2019:

| Year | Number of Certificates of Goodstanding Issued | Number of New Corporations Formed |
|---|---|---|
| 2010 | 1,760 | 149 |

| Year | Number of Certificates of Goodstanding Issued | Number of New Corporations Formed |
|------|-----------------------------------------------|-----------------------------------|
| 2011 | 1,520 | 126 |
| 2012 | 1,273 | 128 |
| 2013 | 1,237 | 140 |
| 2014 | 950 | 92 |
| 2015 | 842 | 84 |
| 2016 | 688 | 59 |
| 2017 | 614 | 46 |
| 2018 | 518 | 56 |
| 2019 | 426 | 35 |

63.     Notwithstanding Legality's failure to perform, LISCR continued to pay Legality to avoid the distraction and cost of litigation, and because the Parties' contractual relationship had a fixed, approaching termination date in December 2019.  LISCR is entitled to, at minimum, restitutionary and/or recissionary damages as a result of Legality's inaction and breach.

**D.  Legality's Unjustified Demand for Performance Under the 2000 Agreement**

64.     The 2014 Agreement had an explicit termination date of December 31, 2019. Because Legality's role in promoting the Liberian Registry (and the need for it) had steadily declined over time, the Parties agreed and understood that their contractual relationship would end on December 31, 2019.  Legality agreed to this fixed termination date when it entered into the 2011 and 2014 Agreements.

65.     When LISCR representatives confirmed, consistent with these Agreements and the Parties' documented understanding, that their relationship would end in December 2019, Legality suddenly asserted—for the first time—that the 2000 Agreement had remained valid all this time, and that they were owed payments going forward, with no end in sight, as set forth in the 2000 Agreement.  These assertions were made out-of-the-blue a full eight years after the 2000

Agreement was first superseded in 2011 and eight years after LISCR had begun performing under the 2011 Agreement instead of the 2000 Agreement.  During the previous eight years, no one from Legality had ever claimed that payments under the 2000 Agreement remained due and owing. Indeed, during preliminary discussions in early 2019 about potentially entering into a new agreement, Adam Cohen, the executive chairman of LISCR, stated that a new agreement may be prudent because the 2014 Agreement was set to expire, to which Alexandre Soutos responded "I fully agree."  Mar. 14, 2019 WhatsApp Message from Alexandre Soutos.  Those preliminary discussions never materialized into a new agreement between the Parties.

66.     Despite acknowledging that Legality's contract and relationship with LISCR was set to expire and never before expressing a view that the 2000 Agreement was still valid, on December 29, 2019, Alexandre Soutos emailed Mr. Cohen, asserting that "The 2000 Agreement is in force and shall regulate both parties['] rights and obligations as from 1st January 2020, for as long as the contract between LISCR and the REPUBLIC OF LIBERIA remains in existence." Dec. 29, 2019 Email from Alexandre Soutos.

67.     Over the next few months, Mr. Soutos repeated his demands for payment based on Legality's contention that the 2000 Agreement remained valid on numerous occasions, reiterating without basis and contrary to the Parties' intent, that the 2011 and 2014 Agreements "constitute just a complement to the 2000 Agreement" that were "in force only for a limited period of 10 years" and do "not supersede the '[2000] Agreement,'" and that the "the basic initial agreement of 2000 . . . is still valid and in full force."  *See, e.g.*, Feb. 4, 2020 Email from Alexandre Soutos; Mar. 16, 2020 Email from Alexandre Soutos.

68.     Indeed, Legality takes the position that the 2000 Agreement will remain in force as long as LISCR is under contract to provide shipping and corporate registration services to the

Government of Liberia.  Therefore, according to Legality, no superseding agreement, present or future, could alter this indefinite relationship, and "there's no room for alternative interpretations." Jan. 15, 2020 Email from Alexandre Soutos; June 17, 2020 Email from Alexandre Soutos.

69.     In response to such disingenuous and baseless statements, Mr. Cohen has consistently conveyed to Legality that the later agreements superseded the 2000 Agreement such that no further obligations under the 2000 Agreement remain.  Moreover, on March 17, 2020, Mr. Cohen informed Mr. Alexandre Soutos that Legality must cease to hold itself out as a representative of LISCR because it no longer had any delegation of authority from LISCR, after the expiration of the 2014 Agreement at the end of 2019.

70.     Mr. Alexandre Soutos nevertheless has continued to assert that the 2000 Agreement remains valid and that LISCR is contractually obligated to pay money to Legality.  Mr. Soutos has demanded payment of a specific amount of fees that he contends are owed to Legality.  More bizarrely (and indicative of an attempt to chase a payday), Mr. Soutos is not articulating a demand for payment that adheres to the payment scheme in the 2000 Agreement.  He is instead demanding that LISCR pay Legality according to the now-expired 2014 Agreement—*i.e.*, $62,500 per quarter.

71.     LISCR believes that Legality will continue to demand payment based on its contention that LISCR is still contractually obligated under the defunct 2000 Agreement.

72.     While seeking to enforce the 2000 Agreement, Legality has nevertheless ceased to perform its duties under that Agreement.  In particular, Legality ceased undertaking efforts to promote the Liberian Registry to corporate entities—the central role it was hired to perform in the first place.  Thus, Legality's latest demands amount to no more than a request for an undeserved windfall—having become accustomed to payments from LISCR over 20 years, Legality simply

seeks a continuation of such payments despite there being no contractual basis for claiming them and despite failing to perform its contractual obligations.

73.     LISCR has paid Legality in full through December 31, 2019, as required under the Agreements.

74.     LISCR seeks a declaration that Legality and LISCR no longer have any rights or obligations under the Agreements because the 2000 Agreement was superseded by the 2011 and 2014 Agreements, the 2011 Agreement was superseded by the 2014 Agreement, and the 2014 Agreement expired, by its terms, on December 31, 2019.

75.     In the alternative, LISCR seeks damages for Legality's failure to perform under the Agreements.  Such breaches were material to the Agreements and, to the extent the 2000 Agreement remains valid, any ongoing obligations by LISCR have been terminated as a result of Legality's own failure to perform.

76.     LISCR has a real and reasonable apprehension of litigation regarding payments Legality believes it is owed from the first fiscal quarter of 2020 and onward, indefinitely.

77.     Given the definite, concrete, real, and substantial dispute between LISCR and Legality regarding the scope and applicability of the Parties' rights and obligations to one another and Legality's express and repeated threats to attempt to enforce the 2000 Agreement that was extinguished both by the 2011 Agreement and again by the 2014 Agreement, an actual controversy exists as to the Parties' rights and obligations under the Agreements.

**CLAIMS FOR RELIEF**

**COUNT I:**
**DECLARATORY RELIEF**

78.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth in all preceding paragraphs as if fully set forth herein.

79.     LISCR seeks relief under the Declaratory Judgment Act, 28 U.S.C. § 2201, and Fed. R. Civ. P. 57 based on the existence of an actual controversy between LISCR and Legality with respect to their rights, duties, and obligations to one another under the Agreements.

80.     There is a dispute between the Parties as to whether they are still bound by the Agreements and, if so, what remaining rights, duties, and obligations remain.  Resolution of this controversy is necessary in order to resolve the claims between the Parties.

81.     Plaintiff contends that the 2000 Agreement and 2011 Agreement have been superseded and replaced by the 2014 Agreement and therefore that the 2000 Agreement and the 2011 Agreement are no longer binding on the Parties.

82.     Plaintiff contends that the 2014 Agreement has expired by its terms.

83.     Plaintiff contends that no rights, duties, or obligations remain between the Parties.

84.     Defendant denies all of the above and, beginning in at least December 2019, it began repeatedly demanding that payments under the 2000 Agreement are due and owing even though it did not seek such payments between 2011 and late 2019.

85.     The instant declaratory judgment action is the proper and most efficient manner in which to resolve the Parties' disputes.

86.     In filing this action, LISCR raises an "actual controversy" "of sufficient immediacy and reality to warrant issuance of a declaratory judgment."

87.     Based on the foregoing, LISCR specifically requests that this Court enter a judgment declaring that:  (a) the 2000 Agreement was a valid and enforceable contract; (b) the 2011 Agreement was a valid and enforceable contract that superseded the 2000 Agreement; (c) the 2014 Agreement was a valid and enforceable contract that superseded the 2011 Agreement; and (d) LISCR has no remaining obligations to Legality.

88.     In seeking declaratory relief, LISCR comes to this Court with clean hands and offers to do equity.

## COUNT II:
## BREACH OF CONTRACT

89.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth in all preceding paragraphs as if fully set forth herein.

90.     Through their actions and omissions in relation to promotion of the Liberian Registry, Defendant has breached its contractual obligations under the Agreements.

91.     Defendant's breaches were not in good faith.

92.     LISCR performed all of its obligations under the Agreements.

93.     As a direct and proximate result of such breaches, LISCR has been deprived of the benefits of the Agreements for which it paid significant compensation.

94.     LISCR is entitled to judgment for breach of contract in an amount to be determined at trial, and a judgment that as a result of Legality's repeated pattern of material breaches, any remaining obligations under the Agreements are extinguished.

## PRAYER FOR RELIEF

In light of the foregoing, Plaintiff respectfully prays that this Court enter judgment in its favor and against Defendant Legality Holdings, S.A. as follows:

A.  On Count I, a declaration of the rights and obligations of the Parties with respect to the Agreements, including that (a) the 2000 Agreement was a valid and enforceable contract; (b) the 2011 Agreement was a valid and enforceable contract that superseded and replaced the 2000 Agreement; (c) the 2014 Agreement was a valid and enforceable contract that superseded and replaced the 2011 Agreement; and (d) LISCR has no remaining obligations to Legality;

B. On Count II, a money judgment in an amount that proof will establish for the Defendant's breach of the Agreements, and a judgment that as a result of Legality's repeated pattern of material breaches, any remaining obligations under the Agreements are extinguished;

C. On all counts, an award to Plaintiff of its attorneys' fees and costs; pre- and post-judgment interest; and such other and further relief as the Court deems just and appropriate.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Respectfully submitted,

Dated:  Washington, D.C.
       July 23, 2020

QUINN EMANUEL URQUHART &
   SULLIVAN, LLP

*/s/ M. Loughran Potter*

William A. Burck (*pro hac vice* forthcoming)
Keith H. Forst (*pro hac vice* forthcoming)
M. Loughran Potter (VSB #85163)
Deborah S. Sohn (*pro hac vice* forthcoming)
1300 I Street NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 538-8000
Facsimile: (202) 538-8100
williamburck@quinnemanuel.com
keithforst@quinnemanuel.com
loughranpotter@quinnemanuel.com
deborahsohn@quinnemanuel.com

Scott L. Watson (*pro hac vice* forthcoming)
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

scottwatson@quinnemanuel.com

*Attorneys for Plaintiff*